# UNITED STATES DISTRICT COURT
## for the SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

| | |
|---|---|
| ANDREA PRESSER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| *vs.* | ) CAUSE NO.  1:12-cv-835-SEB-DKL |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Andrea Presser applied for a declaration of a period of disability and for benefits under the disability insurance benefits and supplemental security income programs of the Social Security Act.  She alleged a disability beginning in January 2006.  After the defendant Commissioner of Social Security finally denied her application, she brought this suit for judicial review.  The Honorable Sarah Evans Barker, district judge, referred the issues presented in this Cause to this magistrate judge for submission of a report and recommendation as to their disposition.  *Order Referring Matter to Magistrate Judge* [dkt. 24].  This Report and Recommendation fulfills that referral.

### Standards of review and disability

Judicial review of the Commissioner's factual findings is deferential:  courts must affirm if her findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a scintilla, but less than a

preponderance, of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004). This limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). *Carradine*, 360 F.3d at 758. While review of the Commissioner's factual findings is deferential, review of her legal conclusions is *de novo*. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. §§ 416(i)(1) and 423(d)(1)(A). A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do her previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The combined effect of all of an applicant's impairments shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).

The Social Security Administration ("SSA") has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. 20 C.F.R. § 404.1520. If disability status can be determined at any step in the sequence, an application will not be reviewed further. *Id.* At the first step, if the applicant is currently engaged in substantial gainful activity, then she is not disabled. At the second step, if the applicant's impairments are not severe, then she is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, if the applicant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the applicant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the SSA has pre-determined are disabling. 20 C.F.R. § 404.1525. If the applicant's impairments do not satisfy a Listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is an applicant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations and is categorized as sedentary, light, medium, or heavy. 20 C.F.R. § 404.1545. At the fourth step, if the applicant has the RFC to perform his past

relevant work, then she is not disabled.  Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and her RFC, she will not be determined to be disabled if she can perform any other work that exists in significant numbers in the national economy.

The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"),  may be used at step five to arrive at a disability determination.  The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled. 20 C.F.R. §§ 404.1569 and 1569a.  If an applicant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at her assigned RFC level, then the grids may not be used to determine disability at that level; a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics.  *Id.*; *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).  The grids result, however, may still be used as an advisory guideline in such cases.  20 C.F.R. § 404.1569.

An application for benefits, together with any evidence submitted by the applicant

4

and obtained by the agency, undergoes initial review by a state-agency disability examiner

and a physician or other medical specialist.  If the application is denied, the applicant may

request reconsideration review, which is conducted by different disability and medical

experts.  If denied again, the applicant may request a hearing before an administrative law

judge ("ALJ").[1]  An applicant who is dissatisfied with the decision of the ALJ may request

the SSA's Appeals Council to review the decision.  If the Appeals Council either affirms or

declines to review the decision, then the applicant may file an action in district court for

judicial review.  42 U.S.C. § 405(g).  If the Appeals Council declines to review a decision,

then the decision of the ALJ becomes the final decision of the Commissioner for judicial

review.

### Procedural background

After Ms. Presser's application was denied on initial and reconsideration reviews,

(R. 149-160, 163-168), she requested and received a hearing before an ALJ, (R. 87, 142).  A

physical medical expert, a psychological medical expert, a vocational expert, and Ms.

Presser testified at the hearing.  The ALJ issued a decision denying Ms. Presser's

application.  (R. 30.)  At step one, he found that she was had not engaged in substantial

gainful activity since her alleged onset date.  At step two, he found that she had severe

impairments of rheumatoid arthritis, fibromyalgia, degenerative disc disease of the lumbar

---

[1] By agreement with the SSA, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration.  20 C.F.R. Part 404, Subpart Q (§ 404.1601, *et seq.*).  Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal SSA.

spine, obstructive sleep apnea, obesity, bipolar disorder, post-traumatic stress disorder, and a past history of alcohol abuse. At step three, he found that she does not have an impairment or combination of impairments that meet or equal any of the Listing of Impairments. For the purpose of steps four and five, the ALJ determined that Ms. Presser had the RFC for sedentary work with the following additional pertinent restrictions: "the claimant's work must [be] limited to tasks which are simple and repetitive and require no more than occasional contact with the general public, coworkers and supervisors." (R. 38.)

At step four, the ALJ found that Ms. Presser is unable to perform any of her past relevant work. At step five, the ALJ relied on the testimony of the vocational expert and the grids as a framework to conclude that she retained the capacity to perform three job titles representing a total of 3,294 jobs in the region of Indiana. (R. 136, 44). Because he found these to be significant numbers, the ALJ found that Ms. Presser is not disabled. When the Appeals Council denied Ms. Presser's request for review, (R. 13), the ALJ's decision became the final decision of the Commissioner on her claim and the one that the Court reviews.

### Discussion

Ms. Presser asserts two reversible errors in the ALJ's decision.

**1.   Failure to account for moderate difficulties in maintaining concentration, persistence, or pace.**  The ALJ found that Ms. Presser has moderate difficulties in

concentration, persistence, and pace.  (R. 37.)   His description of her RFC and his hypothetical to the VE, did not articulate the moderate difficulties *per se*; rather they limited her to "tasks which are simple and repetitive."  (R. 38, 136.)  Ms. Presser argues that this violates the rule declared in *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), which held that, as part of an ALJ's requirement to orient a VE to the totality of a claimant's limitations, the VE must be told of deficiencies of concentration, persistence, or pace, and the most effective way to ensure that a VE is fully apprised is for the ALJ to include the deficiencies in his hypotheticals at the hearing, *id.* at 619.  The decision also declared that "[i]n most cases, . . . employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace," *id.* at 620, because even simple and repetitive tasks might be difficult for a claimant with concentration, persistence, or pace deficiencies to perform.  At Ms. Presser's hearing, the ALJ's hypothetical to the VE included a limitation to simple, repetitive tasks, but did not include the language of "moderate difficulties of concentration, persistence, or pace."  Ms. Presser contends that this was error.

*O'Connor-Spinner* does not require use of the specific terminology of concentration, persistence, or pace in all circumstances.  Two exceptions have been recognized generally in the case law.[2]  First, if the record reveals that the VE independently reviewed the medical

---

[2] The Court of Appeals emphasized, as does this Court, that "[y]et, for most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do."  *O'Connor-Spinner*, 627 F.3d at 620-21.

evidence or heard the medical testimony that was directly relevant to the deficiencies, then the VE's familiarity with a claimant's limitations can be assumed despite gaps in the ALJ's hypotheticals. *O'Connor -Spinner*, 627 F.3d at 619. However, if an ALJ poses a series of increasingly restrictive hypotheticals to the VE, the assumption is that the VE's attention was focused on the hypotheticals and not other evidence in the record or testimony. Second, if the ALJ's alternate phrasing accurately excludes the functions that the claimant cannot perform due to his deficiencies, then the VE has been fully advised; in other words, when the ALJ's hypothetical excludes the triggers or causes of the claimant's deficiencies, then the deficiencies have been accommodated. The example that *O'Connor-Spinner* cited as the most frequent application of this exception is when a claimant's deficiencies in concentration, persistence, or pace are stress- or panic-related and the ALJ's hypothetical restricts the claimant to low-stress work. *Id.* at 620.

A version of the second exception is when the ALJ includes in his hypothetical the limitations into which a medical expert has translated a claimant's deficiencies. *See Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002). That is what happened in this case. At the hearing, the psychological expert, Dr. Pitcher, testified that Ms. Presser was "moderately to maybe even markedly limited" in her abilities to understand, remember, and carry out detailed instructions, and was "moderately" limited in her abilities to maintain attention, sustain concentration and persistence, work in coordination with others, and interact socially. (R. 129-30.) Dr. Pitcher also testified that, to accommodate

these deficiencies, Ms. Presser should be limited to simple, repetitive, and routine tasks, and should have no more than superficial interaction with the general public, coworkers, and supervisors. (R. 130-31, 134.) Immediately after Dr. Pitcher testified, the ALJ asked the VE — who was present during Dr. Pitcher's testimony and asked follow-up questions of her — to incorporate Dr. Pitcher's restrictions into the ALJ's hypothetical, highlighting the restrictions to simple, repetitive tasks and limited contact with people. (R. 135-36.)

Ms. Presser does not challenge the accuracy of Dr. Pitcher's opinions about the severity of her concentration, persistence, or pace deficiencies or the adequacy of her work restrictions as accommodations. Because Dr. Pitcher translated Ms. Presser's deficiencies into specific restrictions and ALJ incorporated those restrictions into his hypothetical to the VE, the ALJ's decision does not violate the rule of *O'Connor-Spinner.*

**2.   Evaluation of Dr. Riddle's opinion.**  Since 2007, Ms. Presser has received treatment at the Gallahue Mental Health Center's Crestview Center in Anderson, Indiana. In early 2009, the treatments included twice-weekly visits with a therapist; quarterly visits with an available doctor; and medication management. (R. 867.) On January 20, 2009, Michael Riddle, M.D., a psychiatrist at the clinic, countersigned a non-SSA "Mental Residual Functional Capacity Questionnaire" (source unknown) that had been completed by a licenced clinical social worker ("LCSW") at the clinic.[3]  (R. 867-72.)  The LCSW

_____

[3] The Commissioner identified this LCSW as Ms. Presser's "primary therapist." (*Defendant's Brief* [dkt. 22] at 11.)

described Ms. Presser's "Treatment and Response" as "1:1 Therapy, Medication Management.  Responding well to meds. [and] Therapy.  Client is compliant." (R. 867.) The LCSW described the clinical findings, including results of mental status examinations, that demonstrated the severity of Ms. Presser's mental impairment and symptoms as: "stable on medications.  MSE [mental status examination] – within normal limits." (*Id.*) Prognosis was described as "should stay stable w/ continued med. management [and] Therapy." (*Id.*)

In three check-a-box tables on this form, the LCSW rated Ms. Presser's "ability to do *work-related activity on a day-to-day basis in a regular work setting.*" (R. 870-71).  She rated Ms. Presser as "Unable to meet competitive standards" in the two areas of "Maintaining regular attendance and be punctual within customary, usually strict tolerances" and "Travel in unfamiliar place." (*Id.*) She rated Ms. Presser as "Seriously limited, but not precluded" in the areas of **(1)** "Work in coordination with or proximity to others without being unduly distracted," **(2)** "Perform at a consistent pace without an unreasonable number and length of rest periods," **(3)** "Accept instructions and respond appropriately to criticism from supervisors," **(4)** "Understand and remember detailed instructions," **(5)** "Carry out detailed instructions," and **(6)** "Use public transportation."[4] (*Id.*)  The form assigns Ms. Presser current and highest-past-year Global Assessment of Functioning ("GAF") scores of 68,

---

[4] The Commissioner translates the form's rating of "Unable to meet competitive standards" to "severe" and its rating "Seriously limited, but not precluded" to "marked." (*Defendant's Brief* [dkt. 22] at 11.)

10

within the range 61 to 70 which represents "[s]ome mild symptoms (*e.g.*, depressed mood and mild insomnia) *or* some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." The LCSW noted that it was unknown how often Ms. Presser's impairments or treatment would cause her to be absent from work. (R. 872.)

By the date that the questionnaire was completed, Dr. Riddle had seen Ms. Presser at the clinic only once: 12 days earlier, on January 8, 2009, for a 15-minute visit, which was reported in one paragraph on a "Medication Progress Note – Narrative Only."[5]  (R. 860, 964.) Both Ms. Presser and the Commissioner characterize the ratings on the questionnaire as more limiting than the other medical opinions of record relied upon by the ALJ.

Ms. Presser argues that the mental RFC questionnaire represents the opinion of Dr. Riddle, one of her treating physicians, and that the ALJ erred by not properly evaluating it, and articulating his evaluation of it, according to the rules governing treating-source opinions.

The SSA has defined a protocol for evaluating and assigning weight to treating

---

[5] The Commissioner asserted that Dr. Riddle saw Ms. Presser in July 2007, (*Defendant's Brief* at 10), but she misread the year, which is 2009. The Commissioner's argument also mistakenly assumed that the mental RFC questionnaire was completed *after* Dr. Riddle's three visits with Ms. Presser at the clinic. (*Id.* at 10.)  In fact, the form was completed only 12 days after Dr. Riddle's first visit with Ms. Presser and months before his last two visits with her in April and July 2009.  (R. 844, 860, 862 (duplicated at 948, 964, 966).)

sources:

Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) *Nature and extent of the treatment relationship*.  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.   When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) *Supportability*.  The more a medical source presents relevant

evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527(c)(2). In general, ALJs are required to expressly articulate their evaluations of treating-source opinions, including separately addressing relevant subparts of opinions. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998).

In this case, the ALJ assigned no weight to the opinions represented by the mental RFC questionnaire. He gave the most probative weight regarding Ms. Presser's mental impairment and limitations to the opinion of Dr. Pitcher, the testifying psychological

expert, which he found was well supported by the objective and clinical evidence, and not inconsistent with the assessments of the state-agency reviewing psychologists. The ALJ gave "no weight" to the opinion of Dr. Riddle because, while Dr. Riddle countersigned the questionnaire, there was "no evidence characterizing his involvement in the claimant's treatment and/or evaluation." In addition, the ALJ found the questionnaire's GAF scores of 68 "*wholly inconsistent* with the conclusion the claimant has 'marked' limitations in social functioning and concentration, persistence and pace." (R. 43.) Ms. Presser contends that the ALJ committed 3 errors in his evaluation of Dr. Riddle's opinion.

   **a. The ALJ overlooked Dr. Riddle's treating relationship.** Ms. Presser argues that the ALJ was mistaken when he found "no evidence" showing Dr. Riddle's involvement in the treatment of Ms. Presser and, therefore, he failed to properly evaluate Dr. Riddle's opinion as one from a treating source.[6] As noted, the Commissioner concedes that the ALJ overlooked the treatment history but argues that the history of 3 visits for a total of 45 minutes was too sporadic and limited to accord Dr. Riddle's opinions controlling weight. Ms. Presser counters that, under SSA's definition, a source can be a treating source if a claimant has seen the source "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." 20 C.F.R. § 404.1502 ("We may consider an acceptable medical source who

---

   [6] The ALJ wrote that he gave no weight to the "opinions of the claimant's 'treating' physicians," including Dr. Riddle. He put the term "treating" in quotes, thus emphasizing his question about Dr. Riddle's status as a treating source.

has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)"). Ms. Presser contends that, because the Commissioner failed to show that Dr. Riddle's treatment history was not typical for her conditions and limited financial resources,[7] the ALJ should have recognized Dr. Riddle as a treating source and evaluated his opinion accordingly.

While the ALJ did overlook the record evidence of Dr. Riddle's three-visit, 45-minute treatment history, only his first visit actually was relevant.   Dr. Riddle countersigned the questionnaire after only his first visit with Ms. Presser and his second and third visits, in April and July 2009, occurred months after the questionnaire was completed.  Thus, the treating relationship overlooked by the ALJ consisted of only 1 visit for 15 minutes, apparently for the purpose of a medication follow-up.[8]  Under the SSA's "length of the treatment relationship and the frequency of examination" and "nature and extent of the treatment relationship" factors for evaluating treating sources, 20 C.F.R. § 404.1527(c)(2)(i) and (ii), little, if any, special weight reasonably would be accorded to Dr. Riddle's opinions in these circumstances.

---

[7] The Court notes that Ms. Presser also did not make any argument or showing that the nature of her conditions or finances reasonably explained the number of visits to Dr. Riddle.

[8] Ms. Presser also cited record evidence consisting of medications lists for Ms. Presser on which Dr. Riddle is listed as the "Prescriber."  However, the earliest start dates for those prescriptions are in April 2009, which is weeks after the January 2009 questionnaire was completed.  (R. 842-43 (duplicated at 946-47).)

To the extent that the questionnaire represents Dr. Riddle's opinions, they could have been based only on secondary sources, such as Dr. Riddle's review of the clinic notes or talking with staff, not his own observations or personal knowledge.  The ALJ correctly noted that there is no evidence characterizing the nature of Dr. Riddle's involvement in the evaluations of Ms. Presser's condition and limitations that are reflected in the questionnaire.  Thus, there was no reason for the ALJ to give Dr. Riddle's opinions in the questionnaire any special weight compared to the opinions of Dr. Pitcher, who also reviewed all of the medical and other evidence of Record which was not available to Dr. Riddle, and who observed Ms. Presser's testimony at the hearing, or compared to the state-agency reviewing psychologists who reviewed the evidence of record.

**b. The ALJ mistakenly found Dr. Riddle's GAF scores to be inconsistent with his severity opinion.**  The ALJ rejected Dr. Riddle's opinion in part because he found it internally inconsistent:  he found the questionnaire's assigned GAF scores of 68 to be "*wholly inconsistent* with the conclusion that the claimant has 'marked' limitations in social functioning and concentration persistence and pace."  (R. 43).  Ms. Presser argues that, "[w]hile a GAF rating is evidence, in the case at bar Dr. Riddle's GAF rating is not even a scintilla of evidence justifying rejection of his opinions at issue."  (*Plaintiff's Brief* [dkt. 19] at 11-12 (citation omitted).)  As noted above, a GAF score in the range of 61-70 represents "mild symptoms" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well . . . ."  Ms. Presser does not explain why her scores, at the

16

higher end of this scale, are not even a scintilla of evidence showing an internal inconsistency with the questionnaire's severe functional ratings.  The Court agrees with the Commissioner that the mild GAF scores of 68 are so out-of-line with the questionnaire's "marked" limitations in 7 functional categories and (essentially) "extreme" limitations in 2 functional categories, that the ALJ was justified in relying on the inconsistency in determining the weight to accord Dr. Riddle's opinion.[9]

c. **Separate evaluations.**  Ms. Presser argues that the ALJ failed to separately evaluate each of Dr. Riddle's opinions on the different aspects of her condition and limitations.  She cites the following instruction in Social Security Ruling 96-5p, which provides guidance to SSA decision-makers on the evaluation of treating-source opinions: "[a]djudicators must remember, however, that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one."  However, the reasons given by the ALJ for rejecting the opinions expressed in the questionnaire were foundational and general; they did not involve issues that affected individual functional ratings separately.  The ALJ did not err in this respect.

---

[9] Although not cited by the ALJ, the Court also notes that the questionnaire's marked and extreme ratings appear inconsistent also with its description of its supporting finding as "stable on medications" and a mental status examination "within normal limits," (R. 867), and a prognosis of staying stable with continued medications management and therapy.  (*Id.*)

17

**Whether remand would be futile.**  The ALJ erred when he found no evidence showing a treating relationship between Dr. Riddle and Ms. Presser.  The Commissioner argues that his error was harmless and a remand to correct that small factual error would be futile because it is not likely to change the ALJ's decision.  A court should not remand a case for further specification or reconsideration if it is convinced, "with great confidence," that the ALJ will make the same decision.  *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("That would be a waste of time and resources for both the Commissioner and the claimant."); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.").  The Court must determine whether a remand is warranted in this case.

The ALJ gave no weight to the opinions expressed in the questionnaire because he found no evidence characterizing Dr. Riddle's treating relationship with Ms. Presser or his involvement in the evaluations expressed therein, and the questionnaire's assigned GAF scores of 68 were inconsistent with its marked and extreme functional ratings.  But the ALJ overlooked only Dr. Riddle's one 15-minute medication check-up visit with Ms. Presser before the questionnaire was completed.  That is not a length or nature of treating relationship that justifies according his opinions much, if any, weight.  Considered with, first, the absence of any indication of the nature of Dr. Riddle's involvement in the

evaluations recorded in the questionnaire and, second, the inconsistent GAF ratings, it is not reasonably likely that the ALJ would change his evaluation of the questionnaire's weight if the Court were to remand this case for reconsideration in light of the ALJ's mistake.

The ALJ also implicitly found the questionnaire's opinions to be inconsistent with the other substantial evidence in Ms. Presser's case record — a legitimate factor for evaluating treating-source opinions, 20 C.F.R. § 404.1527(c)(2) — when he gave the most probative weight to the contrary opinions of Dr. Pitcher, which the ALJ noted were consistent with the opinions of the state-agency reviewing psychologists. (R. 43.) 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion".).  Ms. Presser did not challenge this implicit finding.

Although not cited by the ALJ, but relevant to the Court's analysis of whether a remand would be futile, the questionnaire does not provide the medical bases for its functional ratings.  Thus, under "medically acceptable clinical and laboratory diagnostic techniques," "relevant evidence," and "supportability" factors for evaluating treating-source and non-treating-source opinions, 20 C.F.R. § 404.1527(c)(2) and (3), it is unlikely that the ALJ would accord much, if any, weight to the questionnaire on remand.  The questionnaire's only indication of support is actually contrary to its ratings:  when asked to "[d]escribe the *clinical findings* including results of mental status examination that

demonstrate the severity of your patient's mental impairment and symptoms," the questionnaire's answer is "stable on medications.   MSE [mental status examination] — within normal limits" (R. 867), which is inconsistent with the questionnaire's marked and extreme ratings of Ms. Presser's functional abilities.

Therefore, the Court is convinced with great confidence that the result would be the same if this case were remanded to the Commissioner for reconsideration in light of the ALJ's mistake regarding Dr. Riddle's treatment history.  It is not likely that the opinions expressed in the questionnaire would be according treating-source status and, considering the questionnaire's internal inconsistencies and lack of supporting material, it is not reasonably likely that the ALJ's findings would be changed in light of his reliance on the opinions of Dr. Pitcher and the state–agency psychologists.

## Conclusion

For the reasons explained above, this magistrate judge recommends that the decision of the Commissioner denying Ms. Presser's application for disability benefits and a period of disability be **AFFIRMED**.

## Notice regarding objections

Within fourteen days after being served with a copy of this recommendation, either party may serve and file specific written objections thereto. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2). A district judge shall make a *de novo* determination of those portions of the recommendation to which objections are made. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(3). Failure to file an objection might result in forfeiture of the right to de novo determination by a district judge and to review by the court of appeals of any portion of the

recommendation to which an objection was not filed. *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011); *United States v. Pineda-Buenaventura*, 622 F.3d 761, 777 (7th Cir. 2010); *Schur v. L. A. Weight Loss Centers, Inc.*, 577 F.3d 752, 761 n. 7 (7th Cir. 2009); *Kruger v. Apfel*, 214 F.3d 784, 787 (7th Cir. 2000); *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

**The parties should not expect extensions of time to file either objections or responses.  No replies will be allowed.**

**DONE this date:**  08/19/2013

_Denise K. LaRue_
Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Norman Lamont Reed
THE LAW OFFICE OF KIMBERLY J. BACON
reedsmithlaw@aol.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov